## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| WHDH-TV, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. _____ |
| ) | |
| v. ) | |
| ) | |
| COMCAST CORP. ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT

Plaintiff WHDH-TV ("WHDH") brings this action against Defendant Comcast Corp. ("Comcast").

## INTRODUCTION

1.     WHDH's claims in this litigation arise out of illegal actions taken by Comcast to augment and exercise its power in the Boston markets for delivery of commercial television programming and local spot advertising following its acquisition of NBC Universal ("NBC").

2.     In order to secure  support from the approximately 200 independently owned and operated NBC affiliates (including WHDH) (the "NBC Affiliates") for Comcast's acquisition of NBC, Comcast entered into a contract with the NBC Affiliates (the "Affiliate Agreement") promising to:

> a.     "continue its cooperative dialogue with its affiliates" as it "negotiates and renews agreements" with those affiliates;
>
> b.     maintain its commitment to free, over-the-air access to NBC programming including in its affiliate negotiations;

      c.      negotiate renewals of affiliate agreements separate from and uninfluenced by Comcast's cable interests; and

      d.      continue to broadcast major sporting events over the air, and not migrate such programming to "linear channels" owned by Comcast.

3.      To protect the public interest, the Federal Communications Commission ("FCC") incorporated similar protections against "affiliate bypass" as express conditions of its approval of Comcast's acquisition of NBC.

4.      Comcast then violated these promises and conditions in Boston, where it is attempting to bypass WHDH, which has served as the NBC affiliate for decades.  Over the past several years, WHDH has repeatedly asked Comcast to negotiate a renewal of their longstanding affiliate relationship, as required by the Affiliate Agreement and Comcast's commitments to the FCC.  While repeatedly promising WHDH that it would discuss an extension of its affiliate agreement "when the time was right," Comcast ultimately refused to negotiate with WHDH at all.  Instead, while it was promising WHDH it would negotiate, Comcast secretly developed and thereafter announced a plan to replace WHDH as its NBC Boston affiliate with a completely new station to be owned and operated by Comcast.

5.      This plan violates Comcast's agreement with the NBC Affiliates not only due to Comcast's refusal to negotiate with WHDH, but also because (1) it will eliminate the option to receive free access to NBC programming for millions of Boston-area viewers, a large number of whom reside in underserved, predominantly minority communities; (2) as Comcast has admitted, the plan is driven by its desire to leverage its cable dominance in Boston, and makes no sense based solely on its broadcast interests in this region; and (3) it will result in the migration of major sporting events to a Comcast owned linear station.

6.      If allowed to proceed, this plan would enable Comcast to augment its already dominant position in the relevant markets for: (1) the delivery of commercial television programming to viewers in the Boston "designated market area" ("DMA"); and (2) the sale of local spot advertisements to cable and over-the-air television stations by advertisers seeking to reach viewers in the Boston DMA, thereby enhancing Comcast's ability to extract supracompetitive prices from advertisers and viewers, and cause anticompetitive harm to other market participants, including WHDH.

7.      Comcast's plan violates the terms of the agreement it made with the NBC Affiliates (including WHDH) in order to secure their support of Comcast's acquisition of NBC (including Comcast's duty of good faith and fair dealing thereunder); the Massachusetts Unfair and Deceptive Trade Practices Act, M.G.L. ch. 93A; and federal and Massachusetts antitrust laws.

**NATURE OF THE ACTION**

8.      WHDH has been NBC's affiliate in Boston since 1995.  Through its nationally recognized innovations in local news programming and extensive investments in the community, WHDH has become a pillar of the Boston community and the face of NBC here.  In fact, WHDH has consistently been NBC's top performing affiliate among the ten largest United States broadcast markets, a group that drives NBC's national ratings.

9.      Comcast, the largest cable company in the world, acquired a controlling ownership interest in NBC from General Electric ("GE") in 2011, and acquired the balance of NBC in March of 2013.  The transaction created a media colossus, resulting in an unprecedented aggregation of media programming content and the means by which that content is delivered to viewers in the United States.   As Comcast acknowledged, its cable assets now dwarf its

broadcast assets, accounting for more than 80% of its cash flow and driving the company's profitability.

10.    The 2011 transaction produced well-documented concerns expressed by thousands of individuals, government agencies, industry participants, and citizen groups about the potential harms that could result from this historic accumulation of power in the television industry.  The NBC Affiliates expressed their concern that Comcast would seek to leverage the market power inherent in combining its control of delivery and content, particularly in local markets such as Boston where Comcast is already the dominant cable and internet provider.  The NBC Affiliates feared that Comcast would be motivated to bypass the NBC Affiliates in order to consolidate and exert its local market power in cable and broadcasting at the expense of the broadcast-affiliate relationship and the important public service role that broadcasters have traditionally played, including the provision of free, over-the-air access to broadcast television.

11.    To address the NBC Affiliates' concerns and secure their support for its highly-scrutinized acquisition, Comcast entered into the Affiliate Agreement in which it committed, among other things, to (1) "continue its cooperative dialogue" in negotiating contract renewals with its affiliates; (2) maintain its commitment to free, over-the-air access to NBC programming, (3) negotiate affiliate agreements based solely upon the broadcast interests of NBC, independent of and uninfluenced by its cable interests; and (4) continue to broadcast major sporting events over the air, and not migrate such programming to linear (i.e., cable) channels.

12.    Once it secured the support of the NBC Affiliates, Comcast was able to obtain FCC approval of the transaction.  To ensure that Comcast would not undermine the important public interest functions served by broadcast networks and their local affiliates, the FCC incorporated into its approval order a wide range of conditions and requirements to prevent

Comcast from abusing its power, including provisions that were expressly adopted from the Affiliate Agreement. Articulating its own concerns about "affiliate bypass," the FCC required Comcast to conduct affiliate negotiations based only upon its broadcast interests uninfluenced by its cable interests, and with a continued commitment to maintaining free, local, over-the-air access to broadcast television.

13.     Shortly after the transaction was completed in March of 2013, and unbeknownst to WHDH, Comcast began to lay the groundwork for its strategy of bypassing WHDH by merging its cable and broadcast assets in Boston in order to leverage its dominant cable franchise, which accounts for approximately 85% of cable subscribers in the Boston area. Specifically, Comcast took steps to move its NBC broadcast programming from WHDH to a new station owned and operated by Comcast, and housed at the facilities of one of its cable networks, New England Cable News ("NECN").

14.     Meanwhile, and unaware of Comcast's strategy, WHDH repeatedly approached Comcast in an effort to commence the promised negotiations regarding renewal of WHDH's affiliation. Although Comcast was contractually obliged to engage in a cooperative dialog with WHDH about the extension of the affiliation relationship, Comcast repeatedly declined to negotiate terms of the renewal, promising instead to do so at some unspecified future date "when the time was right."

15.     After repeatedly promising to discuss with WHDH the renewal of its affiliation but never doing so, on January 7, 2016, Comcast publicly announced that it would not renew its affiliation with WHDH. Instead, Comcast announced that it would build its own affiliate in Boston using NECN—a regional, Comcast-owned cable news network with relatively low ratings and a weak presence in the Boston news market—as a base. This was an unprecedented

step, as no major national broadcaster had ever terminated its relationship with a successful independent affiliate in a major market to build its own local affiliate from scratch.

16.     Later, in explaining to WHDH the reasons for its unusual decision, Comcast executives acknowledged the obvious:  the decision made no sense solely from a broadcasting perspective, and it was driven by Comcast's desire to "leverage" its dominant position in the Boston cable market.  Those executives also admitted that, given how long it takes to build a local broadcast presence from the ground up, it would take ten years to determine whether the "experiment" will work.

17.     The Comcast plan failed, however, to satisfy Comcast's obligation (per the FCC's Order and the Affiliate Agreement) to continue to provide free, over-the-air access to NBC programming because NECN, a regional cable network, cannot transmit over the air.

18.     After breaching its duties to and misleading WHDH, Comcast attempted to purchase WHDH's broadcast assets at a fire-sale price in order to meet its obligations to continue providing free, over-the-air access to the entirety of the Boston market.  WHDH rejected Comcast's purchase overture.

19.     When that effort failed, Comcast decided to broadcast over the air via WNEU-TV ("WNEU"), Comcast's Telemundo station in New Hampshire.  But WNEU's signal does not reach millions of viewers in the greater Boston area that are currently reached by WHDH's signal.  Those viewers—many of whom reside in underserved, predominantly minority communities—will be forced under Comcast's plan to purchase cable (primarily from Comcast) to continue receiving NBC programming.

20.     The actions of Comcast in consolidating and leveraging its newfound market power in Boston violate the terms of the Affiliate Agreement and its obligations of good faith

and fair dealing thereunder.   Specifically, Comcast violated its obligations under the Affiliate Agreement to maintain a cooperative dialogue with WHDH regarding renewal of WHDH's affiliation relationship, to negotiate and renew the existing affiliation agreement in a manner that sustains the community's free, over-the-air access to NBC programming, to prevent its cable interests from influencing its affiliation negotiations, and to refrain from migrating major sporting events to Comcast owned channels.

21.     Comcast has also violated the Massachusetts Unfair and Deceptive Trade Practices Act by, among other things, securing the NBC Affiliates' (including WHDH's) support of the merger through undertakings which, upon information and belief, Comcast did not intend to honor; beginning to effectuate an unlawful plan in Boston shortly after the merger while repeatedly misrepresenting Comcast's intentions to WHDH; refusing to engage in a cooperative dialogue with WHDH regarding renewal of WHDH's affiliation agreement, independent of influence from its cable interests as required by Comcast's contract with the NBC Affiliates and by the terms of the FCC Order; and attempting to devalue WHDH in an effort to purchase the station at a fire-sale price.

22.     Finally, Comcast's conduct violates federal and Massachusetts antitrust statutes because its improper actions were intended to, and did in fact, enhance its already dominant position in the markets for the delivery of commercial television programming and local spot advertising in Boston, harming competition in those markets.

## THE PARTIES

23.     Plaintiff WHDH is a Massachusetts business trust with its principal place of business located in Boston, Massachusetts.   WHDH is a television station, broadcasting on

channel 7, and serving the Boston area.  WHDH has been an NBC affiliate since January 1, 1995.

24.     Upon information and belief, Defendant Comcast is a Pennsylvania corporation with its principal place of business in Pennsylvania.  Comcast has been the nation's largest cable television provider since 2002.  It is a global mass media and technology company and is the largest broadcasting and cable company in the world, by revenue.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount presently in controversy exceeds $75,000, exclusive of interests and costs.

26.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 2201 and 2202, as well as 15 U.S.C. § 4.  The Court has supplemental jurisdiction over WHDH's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This Court has personal jurisdiction over the defendant because (1) the actions in this case arise at least in part out of Comcast's transaction of business and contracting to provide services in the Commonwealth; (2) Comcast's actions complained of herein are causing injury to WHDH in the Commonwealth; and (3) Comcast regularly does business in the Commonwealth.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) and/or (3) as well as 15 U.S.C. § 22 because a substantial part of the events giving rise to the claims occurred in Massachusetts and Comcast is subject to this Court's personal jurisdiction with respect to this civil action.

## FACTUAL BACKGROUND

### The Unique Public Service Function of Television Broadcast Networks and the Critical Role of Local Broadcast Affiliates in Serving the Public Interest

29.     Broadcast television plays a unique role in American society.   Since the Communications Act of 1934, broadcast television licensees have been required to operate in the "public interest, convenience and necessity."   47 U.S.C. §§ 214(a) & 310(d).   This legal framework sets broadcast television apart from other media and other FCC regulated companies, and makes over-the-air broadcasters the "public trustees" of television broadcasting.   Unlike newspapers, magazines, and other newer forms of media like cable and the internet, television broadcasters have affirmative statutory and regulatory obligations to serve the public in specific ways.   Consistent with these obligations, television broadcasters must, by mandate of the FCC, air material that is responsive to the needs and interests of the communities that their stations serve, including local news, information, and public affairs programming.

30.     Local network affiliates play a critical role in fulfilling the public service obligations of broadcast networks, serving dual roles.   On the one hand, local network affiliates provide free, over-the-air access to the network's regular entertainment (e.g., *The Today Show* in the morning, *The Voice* in prime time, and *The Tonight Show Starring Jimmy Fallon* at 11:30 p.m.) and news programming (e.g., *NBC Nightly News*), as well as marquee sports programming (e.g., NFL football games, the Super Bowl, and the Olympics).   On the other hand, they provide content specifically tailored to the local market including, for example, news broadcasts featuring local stories, weather reports, traffic reports, political races, local sports, public affairs, community activities, and emergency services.

31.     Local network affiliates also provide FCC-licensed transmission facilities that make both network and local content available to viewers over the air free of charge.

32.     Although broadcast television remains a vital part of the public dialogue, the media landscape has changed dramatically in recent years.  The advent and proliferation of cable and the internet have fundamentally changed the way many people access news, entertainment, and information.  Cable networks are not subject to the same public interest requirements to which broadcast television stations must adhere, and have an economic incentive to displace and replace free, over-the-air access to television content with cable programming provided for a fee. As a result, preserving over-the-air access has become an increasingly important objective for public interest groups and the FCC.

33.     In the words of the National Association for Broadcasters at a recent hearing of the Energy and Commerce Committee of the United States House of Representatives:  "A healthy, vibrant broadcast industry serves the public interest through locally-focused news, sports, public affairs programming and emergency services.  No other industry has that responsibility and, most importantly, the ability or incentive to serve the needs of the public." *Hearing on "Broadcasting Ownership in the 21st Century" Before the Subcomm. on Commc'ns & Tech.*, 114th Cong. (Sept. 25, 2015) (statement of Gerard J. Waldron, Nat'l Assoc. of Broad.).

**WHDH Has Been a Top NBC Affiliate for More Than Two Decades**

34.     Sunbeam Television Corp. ("Sunbeam") acquired WHDH in 1993.  Shortly thereafter, on January 1, 1995, WHDH became NBC's Boston affiliate.

35.     During the early years of its ownership of WHDH Sunbeam transformed WHDH's news operation, and the local news landscape in Boston, by investing heavily in technology and personnel to create fast-paced newscasts with heavy emphasis on colorful, visually intensive news.

36.     With Sunbeam at the helm, WHDH rose to the top of the Boston DMA by focusing on its innovative news style.  Boston Magazine described WHDH's approach as

providing "more news items per broadcast; more video and graphic elements; more sound effects; more live 'on-the-spot' reporting; and more reliance on good stories . . . . Reporters are always in motion; anchors pop up in different spots around the studio; graphics whoosh on and off the screen.  Each image rushes into the next, with never a breath of dead audio."  David S. Bernstein, *Breaking News*, Boston Magazine, Nov. 2001, http://www.bostonmagazine.com/2006/05/boston-magazine-breaking-news-1/.  The Boston Globe wrote of the WHDH style, "[b]reaking news coverage became the drumbeat of the station. Celebrity anchors and their banter in the studio were deemed less important than placing aggressive reporters on the street to cover events as they unfolded."  Suzanne C. Ryan, *Since an Ownership Shift a Decade Ago, Station Has Transformed Local TV News*, Boston Globe, June 25, 2003, at D1.

37.    WHDH grew into the largest local television news staff in all of New England. James Thistle, then director of Boston University's broadcast journalism program, explained that "the changes at WHDH sent shock waves throughout Boston's conservative news media." Pamela   H.   Sacks,   *Changing   the   Channel:   Ed   Ansin*   (2002), http://www.pamelahsacks.com/changing-the-channel-39.htm.

38.    In response to WHDH's success, stations throughout the nation copied its format and journalism schools changed to reflect its contemporary news style.  David S. Bernstein, *Breaking News*, Boston Magazine, Nov. 2001, http://www.bostonmagazine.com/2006/05/boston-magazine-breaking-news-1/.  WHDH had raised the bar in terms of style and approach, forcing competitors to reevaluate in order to keep pace.  Industry analysts described WHDH as "a top-flight operation," "a power house, definitely at the top of its class."  Jeremy Murphy, *Reclusive Ansin Says Stations Not for Sale*, Mediaweek, Apr. 23, 2001, at 11.

39.     Since that time, WHDH has consistently delivered high quality, award winning local newscasts, broadcasting 43 hours of locally produced newscasts per week along with other quality programming.

40.     WHDH has been the number one station in Boston in 8 out of the last 10 years.

41.     Recent awards received by WHDH include:

a.      38th Annual Boston/New England Emmy Award (2015) wins in the categories for News Specialty Report Business/Consumer, Editor News, Graphic Arts News, News Producer, Reporter-Investigative, and Reporter-General Assignment.

b.       37th Annual Boston/New England Emmy Award (2014) wins in the categories for Spot News, Investigative Report, Graphic Arts News, News Producer, and Reporter-Investigative.

c.      36th Annual Boston/New England Emmy Award (2013) wins in the categories for Business/Consumer Specialty Report, Graphic Arts News, News Producer, and Reporter-Investigative.

d.      National Academy of Television Arts and Sciences Boston/New England Chapter, 2013 Silver Circle Induction:  Byron Barnett (Reporter).

e.      National Academy of Television Arts and Sciences Boston/New England Chapter, 2011 Silver Circle Induction:  Bill Springer (Reporter).

42.     When WHDH first became Boston's NBC affiliate in 1995, WHDH and NBC entered into a ten-year term affiliation agreement.  Since 1995, WHDH and NBC have voluntarily renewed their affiliation agreement without controversy on two separate occasions. It is now set to expire on January 1, 2017.

43. WHDH has been a highly successful affiliate, producing lucrative results for NBC. It was the top performing NBC affiliate station in the top ten television markets in 2015, and in five of the last ten years.

### WHDH Is a Fixture in the Boston Community

44. WHDH's news broadcast studio and offices are located at Bulfinch Place, in the heart of downtown Boston. WHDH's broadcast transmitter is located in Newton, Massachusetts.

45. WHDH's free, over-the-air broadcast reaches approximately 7,126,294 viewers throughout southern New England.

46. WHDH has invested heavily in the Boston community and serving the public interest of its citizens.

47. WHDH offers unique public affairs programming targeting underserved segments of the greater Boston community. For example, WHDH produces and airs:

   a. *Urban Update*, a weekly multicultural program that examines news events and issues that have a broad impact on New England's minority communities.

   b. *Revista Hispana*, a monthly bilingual program addressing news, economic, and political topics of particular interest to New England's Latino community.

   c. *Asian Focus*, a monthly program featuring topics of interest to New England's Asian community.

   d. *Jewish Perspective*, a monthly program featuring a look at the concerns and issues in the New England Jewish community.

   e. *Higher Ground*, a monthly program examining the New England local religious scene and its impact on current social issues.

48.     WHDH has been actively involved in a number of community projects in the greater Boston community.  For example, WHDH and its owner serve Massachusetts through relationships with:

a.      Project Bread, a statewide anti-hunger organization providing funding for hundreds of community-based meal programs and food pantries across the state.  WHDH has been the media sponsor of Project Bread since the 1990s, participating in multiple annual events, providing, producing, and airing public service announcements, and encouraging public participation through its newscasts.  WHDH personalities often emcee and participate in these events.

b.      The American Cancer Society, a nationwide, community-based voluntary health organization dedicated to eliminating cancer as a major health problem.  WHDH provides on-air support and live coverage of American Cancer Society events.  WHDH personalities often emcee and participate in these events.

c.      The Boys and Girls Club of Boston, an organization serving 16,000 children and teens in Boston by addressing crucial youth development needs in a variety of areas, including education, the arts, life skills, leadership, technology, and fitness.  The Boys and Girls Club of Boston operates clubs in Dorchester, Charlestown, Chelsea, Roxbury, Mattapan, Roslindale, Jamaica Plain, and South Boston.  WHDH and its owner have contributed millions of dollars to this organization and helped to found the Charlestown Club's Ansin Youth Center.

d.      YouthConnect, a unique partnership between the Boys and Girls Club of Boston and the Boston Police Department that places clinical social workers in Boston police stations to provide services and support to at-risk youth and their families.   WHDH and its owner helped to found YouthConnect more than fifteen years ago and continue to sponsor its annual basketball tournament that brings together Boys and Girls Club members from different parts of Boston.

e.      The Best Buddies Challenge, a fundraising event to benefit Best Buddies International, a non-profit organization that creates opportunities for individuals with intellectual and developmental disabilities.   WHDH is a major media sponsor of the Best Buddies Challenge.

f.      United Way of Greater Boston, an organization dedicated to serving the Greater Boston community through supporting and funding non-profit partners focused on family financial stability and opportunity, school readiness, and school success.   WHDH and its owner provide annual support to the United Way of Greater Boston.

g.      Fenway Health, a provider of medical care and mental health services to the LGBT community.   Fenway Health's Ansin Building, sponsored by WHDH and its owner, is located at 1340 Boylston Street in Boston's West Fens neighborhood and is the largest facility ever constructed by an organization with a specific mission to serve the LGBT community.

h.      Various Boston-area hospitals, with which WHDH partners in various ways, including sponsoring the annual Boston Health and Fitness Expo.

i.      Emerson College, with which WHDH has a partnership relationship, resulting in the renovation of The Ansin Building, a technical communications building that houses the college's radio station, and the funding of a minority scholarship for Massachusetts students.

**Comcast's Proposed Acquisition of NBC and Objections Based Upon the Potential Abuse of Market Power and Consequent Harm to the Industry, Viewers, and the Public Interest**

49.     On December 3, 2009, Comcast announced that it intended to buy from GE a controlling 51% stake in NBC for $6.5 billion in cash and $7.25 billion in programming value. The proposed transaction was subject to significant regulatory scrutiny and required approval by the FCC and the Department of Justice ("DOJ").  As part of the public comment process, various segments of the American public expressed serious concerns over the unprecedented aggregation of power that would result from the proposed combination.  The FCC received from the public thirteen petitions to reject the proposed transaction and over 29,000 public comments and filings.

50.     The concerns expressed to the FCC fell broadly into two distinct, yet related categories: (1) anticompetitive effects nationally and in local markets resulting from the combined entity's aggregation of market power, particularly in markets in which Comcast is a dominant cable and internet provider (such as Boston); and (2) harm to the broadcast industry and the public interests it has traditionally served given the predominance of Comcast's cable interests.

*Anticompetitive Concerns*

51.     Comcast's acquisition of NBC raised anticompetitive concerns regarding both horizontal concentration (i.e., the consolidation of two companies that previously were competitors) and vertical integration (i.e., the consolidation of two companies that previously were in a supplier/distributor relationship).   Both horizontal concentration and vertical

integration can reduce competition, resulting in higher prices, lower quality and reduced incentives to innovate.

52.    Concerns about anticompetitive harms arising from the horizontal concentration resulting from the Comcast/NBC transaction that were expressed during the FCC review process included, *inter alia*:

a.    The proposed transaction would decrease competition by reducing the number of companies that compete to distribute video programming to viewers.  Because Comcast and NBC formerly competed for delivery of commercial television programming in many large metropolitan areas throughout the United States, the acquisition would concentrate their share of audiences in those overlapping locations (including, for example, the Boston DMA).

b.    The combined entity could demand higher prices from competing cable and satellite companies that wish to deliver  NBC programming, with increased fees being passed on to those other companies' subscribers.

c.    The proposed transaction would reduce competition for local advertising sales by enabling Comcast to consolidate NBC's local broadcast advertising with Comcast's local cable advertising, leading to an increased ability and incentive for Comcast to raise prices across advertising types and to bundle high demand advertising with low demand advertising.  The transaction would also increase the number of advertising platforms under Comcast's control, including broadcast networks, ad-supported cable networks, and local cable systems, along with online advertising.

53. Concerns about anticompetitive harms arising from vertical integration resulting from the transaction that were expressed during the FCC review process included, *inter alia*:

   a. Comcast (with the addition of NBC video content) would use its broadened control over video programming to harm competing cable and satellite providers (as well as online video providers like Hulu and Netflix) by withholding NBC content from rival providers or raising programming prices.

   b. Comcast would discriminate against competing cable and satellite providers by refusing to provide NBC programming to its competitors in the same time frame (e.g., daytime as opposed to prime time) or digital quality (e.g., standard definition as opposed to high definition) as offered over Comcast's cable network.

   c. In its capacity as a provider of internet access services, Comcast would be incentivized to reduce the quality of connections to the websites of its competitors for online video programming, or block access to those websites entirely.

   d. Comcast could hinder the user experience of subscribers to competing cable/satellite companies who use Comcast-provided internet broadband services.

   e. Comcast could force its customers to bundle internet services with cable and/or phone services (rather than allowing stand-alone purchases), thereby limiting consumer choice and tying cable and broadband services by making the bundled option the only reasonable economic choice.

    f.      Comcast could migrate free online programming to its fee-based websites, resulting in less content for consumers who do not subscribe to paid services. This would result in reduced consumer choice and access to information and entertainment, and also hinder the development of the online video industry.

    g.      Comcast would be incentivized to reduce competition from rival video programming networks by withholding carriage of such programming on its cable system or imposing unreasonable terms and conditions of carriage. In doing so, Comcast could reduce the viewership of competing networks, rendering them less attractive to advertisers, and reducing revenues and profits.

*Public Interest Concerns*

54.    Commenters on the planned Comcast transaction and the FCC also highlighted their concerns about potential harms to the public interest. Commenters feared that allowing Comcast to acquire a major broadcast network would undermine the public interest standards, so that  free, over-the-air programming (and the public interest standard) might fall by the wayside. These included concerns that, *inter alia*:

    a.      Comcast's acquisition of NBC would increase Comcast's ability to advance non-broadcast interests (i.e., cable and internet) at the expense of free, over-the-air broadcasting and the American public. For example, Comcast could migrate broadcast programming, in particular, marquee sports programming, to cable networks at the expense of over-the-air broadcasting. Comcast could use its augmented, broad-reaching power to

threaten the NBC Affiliates with the withdrawal of NBC affiliation and harm the network-affiliate relationship.

b.     Comcast's acquisition of NBC would consolidate certain categories of programming targeting the public interest, including sports, news, and women-oriented programming, resulting in the elimination of competition in these areas, less incentive to develop new and innovative programming, and a reduction in the diversity of viewpoints expressed to the public.

c.     The combination of Comcast and NBC would reduce the overall quality and quantity of locally responsive programming, including news and public affairs programming, as it would likely result in consolidation of local news outlets to cut costs and the preemption of local programming (that has historically served "niche" audiences, such as communities of color, low income communities, or other traditionally underserved audiences) by programming geared to a national audience.

d.     Comcast's ownership of NBC would unduly influence the journalistic independence of NBC News operations.

e.     The increased inventory of programming and broadcast outlets that the combined entity would own would threaten all independent programming and content, especially public, educational, and governmental channel programming, because Comcast would have an incentive to use its available channels for its own affiliated programming.

### The NBC Affiliate Agreement with Comcast and NBC

55.     One of the many groups expressing concern over the proposed transaction was the NBC Affiliates, comprised of more than 200 local broadcast station members (including WHDH) located in 47 states that, by contract, carry NBC programming and otherwise represent NBC in their respective local markets.

56.     The NBC Affiliates are represented by the NBC Television Affiliates Association, a trade association that exists for the sole purpose of advancing the interests of its members.  The Association conducts no business independent of its service to its members.

57.     The network-affiliate model, which combines the efficiencies of national production, distribution, and selling with a significant decentralization of control over the ultimate service to the public, is critical to fulfilling the public interest obligations of broadcast television in local markets.  The partnership between NBC and its Affiliates produces a free and widely available package of local and national journalism, weather, sports, emergency information, and other programming and services that connect local viewers to one another, their community, and the country.  Cable programming networks do not often provide many of these services including, for example, local news, traffic, and weather reports (other than through the retransmission of local television stations).  Moreover, cable services are not available free to the public.

58.     The stakes of Comcast's proposed acquisition of NBC were extremely high for the NBC Affiliates.  The transaction would replace the Affiliates' existing network broadcast partner with an entity controlled by Comcast, the nation's largest cable provider, which has an economic incentive to displace broadcast with cable.  The NBC Affiliates were rightfully concerned that the transaction would result in migration of NBC programming, particularly

marquee sports programming, to its national and regional cable networks at the expense of the network-affiliate relationship and the associated public interest goals, including locally produced news and other programming and free, over-the-air access.

59.     While the NBC Affiliates' concerns reflected their own self-interests, they also reflected broader market and public policy concerns.  If the transaction were completed and Comcast permitted to leverage the market power inherent in combining control of delivery and content, particularly in local markets in which Comcast is the dominant cable, video programming, and internet provider, the result would be higher prices to both consumers and advertisers, a degradation of the NBC presence, and a diminished viewer experience, including loss of free access to content.

60.     Opposition by the NBC Affiliates presented a serious threat to the Comcast/NBC transaction, and gaining their support was important to Comcast.   Accordingly, in order to alleviate the NBC Affiliates' concerns and obtain their support for the transaction, on June 3, 2010, Comcast entered into a binding contract with the NBC Television Affiliates Association on behalf of its members.  A copy of the Affiliate Agreement is attached hereto as Exhibit A.

61.     The express intent of the Affiliate Agreement was to "provide the [Affiliate] Association with the assurances it needs to represent to its members that it believes that the network-affiliate relationship we all value so highly will remain strong after the Transaction is consummated."  Affiliate Agreement at 1.

62.     Section 1 of the Affiliate Agreement provides that that "[t]he combined entity remains committed to continuing to provide free over-the-air television through its O&O broadcast stations [stations owned and operated by Comcast] and through local broadcast affiliates across the nation.  As NBC negotiates and reviews agreements with its broadcast

affiliates, NBC will continue its cooperative dialogue with its affiliates toward a business model to sustain free over-the-air service that can be workable in the evolving economic and technological environment."  Affiliate Agreement at 1.

63.     "[I]n furtherance of this commitment," Comcast agreed that, "for a period of ten (10) years after consummation of the Transaction," it would "[m]aintain the [NBC] Network – as made available for broadcast over the air by the [NBC] Network's broadcast television affiliates." *Id.*

64.     Section 2 of the Affiliate Agreement obligates Comcast to "maintain the public's free, over-the-air access to Major Sporting Events."  Comcast agreed that "Major Sporting Events . . . shall continue to be broadcast on the [NBC] Network, and Comcast shall not migrate such Events to any linear programming channel in which Comcast has an ownership interest" until seven years after the acquisition of NBC by Comcast.  *Id*. at 2.

65.     Section 3 of the Affiliate Agreement is intended to prevent Comcast's cable interests from influencing negotiations with the NBC Affiliates.  It requires NBC to "remain solely responsible for negotiating network affiliate agreements with individual NBC Local Affiliates" and prohibits Comcast from using "its control of NBC to engage in conduct that discriminates against any NBC Local Affiliate in the terms and conditions for affiliation or other business arrangements." *Id.* at 3 .

66.     Section 7 of the Affiliate Agreement embodies Comcast's commitment to continue free, over-the-air-broadcast television.  Comcast reiterated its statements "made in the public interest filing at the FCC" pledging to "remain committed to provide ad-supported broadcast television through its O&O broadcast stations and through NBC Local Affiliates across the nation", and to "continue its cooperative dialogue with its affiliates toward a business

model to sustain free over-the-air service that can be workable in the evolving economic and technological environment" as it "negotiates and renews agreements with its broadcast affiliates." Comcast explicitly recognized "the role that NBC Local Affiliates serve in the provision of free, local over-the-air television" and committed to maintaining that role. Affiliate Agreement at 4.

67.    The individual NBC affiliates (including WHDH) were the sole intended beneficiaries of the undertakings and commitments made by Comcast in the Affiliate Agreement.

68.    WHDH was a member of the Board of Directors of the Affiliate Association at the time that the Affiliate Agreement was negotiated and entered into with Comcast.

69.    WHDH understood and believed as a result of the negotiation and execution of the Affiliate Agreement that prior to the expiration of its NBC affiliate agreement at the end of 2016, Comcast would have to negotiate with it regarding a renewal of its affiliation, continuing the "cooperative dialogue" that had existed between them for two decades. WHDH also understood and believed that Comcast could not move major sporting events to a Comcast-owned cable network, and had to maintain continuity of free over-the-air coverage to viewers in the greater Boston area, both commitments which would make it difficult for Comcast to bypass WHDH as the Boston NBC affiliate given the structure of the Boston market. Finally, WHDH believed and understood that Comcast could not negotiate a renewal of its affiliation based upon Comcast's cable assets in Boston, but was to negotiate solely on the broadcasting merits of continuing with WHDH as its Boston affiliate. Given WHDH's consistently strong performance as an NBC affiliate, WHDH also believed that this commitment from Comcast would made it difficult for Comcast to bypass it as the NBC Boston affiliate.

70.     On June 21, 2010,  just a few weeks after the execution of the Affiliate Agreement and in reliance on Comcast's representations and obligations therein, the NBC Television Affiliates Association submitted a public comment to the FCC supportive of the proposed merger, provided that the FCC adopt certain constraints captured by the Affiliate Agreement.

### The FCC Public Interest Statement

71.     During the course of the FCC investigation and review of the proposed transaction, Comcast, GE, and NBC filed with the FCC a "Public Interest Statement" on January 28, 2010, in an effort to persuade the FCC to approve the proposed transaction.  The Public Interest Statement contained sixteen voluntary commitments that the parties proposed become binding upon Comcast upon closing of the acquisition.  The voluntary commitments were intended to reduce the risk of anticompetitive conduct, and to "provide assurances that competition would remain vibrant" following consummation of the merger.

72.     In the Public Interest Statement, Comcast, GE, and NBC "publicly affirmed their continuing commitment to free, over-the-air broadcasting."  The parties promised that "numerous diverse voices and a vibrantly competitive local advertising environment will remain following the combination of NBC's broadcast stations and Comcast cable systems."

73.     The Public Interest Statement further stated that "local broadcast affiliates will benefit by having the full support of Comcast, a company that is focused entirely on entertainment, information, and communications and that has strong incentives – and the ability – to invest in and grow the broadcast businesses it is acquiring, in partnership with the local affiliates."  The Public Interest Statement further explained that the "the transaction places the ownership of NBCU's free over-the-air broadcast businesses into a joint venture that will have

greater incentives to grow and strengthen these businesses, to the benefit of the company, its broadcast affiliates, and consumers."   In support of its promise that the transaction would strengthen, *inter alia*, the NBC television network and the NBC local affiliates, the parties made the following express representation and commitment to the FCC in its application:

> Commitment # 1:   The combined entity remains committed to continuing to provide free over-the-air television through its O&O broadcast stations and through local broadcast affiliates across the nation.   As Comcast negotiates and renews agreements with its broadcast affiliates, Comcast will continue its cooperative dialogue with its affiliates toward a business model to sustain free over-the-air service that can be workable in the evolving economic and technological environment.

As described in paragraph 66, Comcast incorporated this commitment into Section 7 of the Affiliate Agreement.

**The FCC Adopted Provisions from the Affiliate Agreement to Protect the Public Interest**

74.    The FCC agreed with many of the concerns expressed by commentators and objectors.  It found "substantial evidence supporting [] alleged potential harm" and put in place certain "remedial measures—both those suggested by [NBC, GE, and Comcast] and alternative or additional ones."  FCC Memorandum Opinion & Order ("FCC Order"), Jan. 20, 2011, p. 13, *available at* https://transition.fcc.gov/FCC-11-4.pdf.

75.    The FCC ultimately approved the transaction on January 18, 2011.  However, citing its duty to ensure that the transaction is "in the public interest, convenience and necessity," and to "impose remedial conditions to address potential harms likely to result from the transaction," the FCC imposed a number of conditions to its approval.  The "transaction-related conditions" and "voluntary commitments" incorporated into the FCC's 279-page order were intended to mitigate the "threats posed by the proposed transaction to competition, innovation, and consumer welfare."  FCC Order, pp. 3-4, 118-144.

76.     The FCC agreed with the concerns raised by the NBC Affiliates regarding the potential harm to the important network-affiliate relationship and the provision of free, over-the-air access to viewers.  The FCC, therefore, attached as an exhibit to its Memorandum Opinion and Order a complete copy of the Affiliate Agreement.  *See* FCC Order, Appendix F, pp. 193-202.

77.     The FCC also adopted "as conditions" of its approval specific provisions of the Affiliate Agreement, including Section 2 relating to the possible migration of major sporting events from broadcast to cable for the duration specified within the Agreement.  The FCC held that "absent the NBC Affiliates Agreement, Comcast would have an increased incentive and ability to migrate marquee sports programming . . . to Comcast's cable networks, and that such action would harm consumers who rely exclusively on [over-the-air] broadcasting."  *See* FCC Order, pp. 68-69, 134.

78.     The FCC also agreed with the NBC Affiliates that the transaction "poses the potential for [Comcast] to harm the network-affiliate relationship," and therefore adopted "as a condition" of its approval Sections 3 and 7 of the Affiliate Agreement regarding negotiation of affiliate agreements free from influence by Comcast's cable interests, and "affiliate market integrity," respectively.  The FCC found that these provisions were necessary because "once Comcast obtains a controlling interest in NBC, it will have an even greater incentive and ability to bypass the NBC affiliates to advantage its cable systems."  FCC Order, pp. 72, 134.

79.     The FCC imposed numerous other conditions on the transaction, specifically tailored to attempt to address certain of the concerns raised above in paragraphs 52-54.  FCC Order, pp. 118-144.

80.    The FCC conditionally approved the Comcast transaction by a vote of four-to-one.    The one Commissioner who voted against the transaction warned that "Comcast's acquisition of NBC Universal is a transaction like no other that has come before th[e FCC] – ever.    It reaches into virtually every corner of our media and digital landscapes and will affect every citizen in the land."   Ultimately, he found that the transaction "confers too much power in one company's hands."   He worried specifically about the negotiation power Comcast would wield:  "Given the market power that Comcast-NBC will have at the close of this deal over both programming content and the means of distribution, consumers should be rightfully worried." FCC Order, pp. 274-75.

81.    Comcast became the 51% owner of NBC on January 18, 2011.   It became the 100% owner of NBC on March 19, 2013 when it purchased GE's remaining 49% stake in NBC.

**Shortly After Its Acquisition of NBC Comcast Secretly Began to Lay the Groundwork for Bypassing WHDH as Its Boston Affiliate So That It Could Leverage Its Cable Dominance, All While Reassuring WHDH That Comcast Would Negotiate an Extension of Its Affiliation**

82.    From the outset Comcast acknowledged (in a shareholder presentation by its Chairman and CEO Brian L. Roberts) that its existing cable interests (not the NBC broadcasting interests) were the driving financial force behind the new combined entity, with "[c]able channels represent[ing] 82% of the new joint venture's [operating cash flow] and driv[ing] its profitability."    Comcast Investor Presentation, at 4 (Dec. 3, 2009), *available at* http://files.shareholder.com/downloads/CMCSA/789052750x0x336728/546b65cb-9493-4289-aeba-5bfa6eb7cf6e/Comcast_PDF(4)12.03.09.pdf.

83.    Immediately after Comcast obtained complete control over NBC in March 2013, Comcast initiated a plan to bypass WHDH in Boston so that it  could leverage its dominant cable assets here to the detriment of its broadcasting interests, even though doing so would violate its

obligations to the NBC Affiliates and the FCC, harm NBC's local ratings for the foreseeable future, and radically reduce free, over-the-air broadcast of the NBC network to viewers in the Boston DMA.

84.     In July 2013, Comcast engaged in a corporate reorganization that moved NECN—a regional Boston cable news channel long owned by Comcast—from the Comcast Cable side of the business into the NBC-Owned Television Station division of NBC.  This was an unusual move because (1) NECN had long been housed in the Comcast Cable side of the company; (2) the NBC-Owned Television Station division of NBC included only local broadcast stations owned-and-operated by NBC, but no cable programming networks; and (3) NBC already had a broadcast affiliate in Boston, namely WHDH.

85.     Beginning in July 2013, NECN sales representatives informed major advertisers in the Boston DMA—including major advertising clients of WHDH —that NECN (not WHDH) would be the local NBC affiliate in Boston beginning in January 2017.  It did so in an effort to get advertisers to purchase advertising from NECN instead of WHDH.  In reaction, a significant number of WHDH's major advertising customers confronted WHDH regarding the status of its NBC affiliation.

86.     WHDH took its concerns about these NECN rumors directly to Comcast, asking it to explain why NECN was touting itself as the next NBC Boston affiliate.  Comcast assured WHDH that NECN's contentions were untrue, and that Comcast intended to negotiate with WHDH regarding the renewal of its affiliation at some future time.

87.     Notwithstanding Comcast's representations, over the next two years WHDH continued to receive inquiries from its advertisers about NECN's continuing statements that it would become the NBC affiliate in Boston.  In turn, WHDH continued to receive the same

reassurances from Comcast that it would at some point negotiate a renewal of WHDH's affiliation agreement, WHDH relied on those reassurances and used those reassurances to mollify its advertisers.

88.     During this period, WHDH repeatedly attempted to engage Comcast in discussions about renewing its affiliation.   WHDH was attempting to open the "cooperative dialog" about extension of the affiliation relationship in which Comcast had promised to engage. On several occasions Comcast told WHDH that it was not yet ready to negotiate due to continuing uncertainty in the retransmission market, i.e., the market for fees paid by local cable companies to television broadcast stations for permission to carry their signal to cable customers, and therefore wanted to wait to negotiate until closer to the expiration of WHDH's current affiliation agreement.   Comcast's assurances of its intent to negotiate with WHDH continued until the fall of 2015.

89.     Among the Comcast executives providing these reassurances to WHDH were executives with whom WHDH had longstanding relationships.   Throughout the course of WHDH's twenty-two years as a top performing NBC affiliate, WHDH executives had developed relationships of candor and trust with those NBC executives (now employed by Comcast), and as a result believed and relied upon their representations regarding the NBC Boston affiliation.

90.     In fact, it now appears that at the same time it was reassuring WHDH of its intent to negotiate an extension of its affiliation, Comcast had already begun making substantial investments in NECN to house its new Boston affiliate.   Comcast publicly acknowledged in January 2016 that it had been transforming NECN's facilities over time to house the new NBC Boston affiliate alongside NECN by, among other things, building a "brand new, state-of-the-art studio and a brighter, more modern newsroom; upgrad[ing its] tools and technology; . . . [and]

hir[ing] a seasoned news management team."  When NECN's studio was unveiled in February 2015, NECN executives said the transformation had taken a year to complete.  Thus, Comcast had begun investing in the re-branding of NECN as the NBC Boston affiliate at least as early as 2014, and likely earlier, all while it was obliged to be engaging in a "cooperative dialogue" with WHDH to extend WHDH's affiliation agreement (in a manner that would sustain the free, over-the-air broadcast), and representing to WHDH that it would do so "when the time was right."

### Comcast Pulls the Plug on WHDH's Affiliation and Attempts to Buy Its Assets on the Cheap

91.     On Friday, September 11, 2015, WHDH met with the Chairman of NBC Broadcasting, Ted Harbert, and the NBC President of Affiliate Relations, Jean Dietze.  WHDH hoped that Comcast might finally be ready to live up to its obligation to negotiate an extension of their longstanding affiliation relationship, as it had repeatedly said it would.  Instead, the two executives informed WHDH for the first time that Comcast would not renew WHDH's NBC affiliation at the end of 2016.  Rather, Comcast intended to replace WHDH as its Boston affiliate with a new, Comcast owned start-up station located at NECN's facility.

92.     The news contradicted Comcast's repeated assurances for more than two years that it would negotiate the affiliation extension when the time was right, as it was contractually obligated to do.

93.     Ted Harbert told WHDH that it "should have known" about the move to NECN because rumors had been swirling and keeping those rumors at bay had proven difficult for Comcast.  In other words, Comcast admitted that it had been trying to keep hidden from WHDH its plan to create a new NBC affiliate housed at NECN, and took the position that WHDH should have believed the very same rumors that Comcast had repeatedly told it to ignore.

94.     The following Monday, September 14, 2015, Valari Staab, the President of the NBC-Owned Television Station division, offered to buy the WHDH broadcast facilities for $200 million, a price far below WHDH's market value of more than $500 million as an NBC affiliate. Ms. Staab acknowledged that the price offered reflected WHDH's diminished value resulting from Comcast terminating its affiliation.  By way of comparison, WHDH's broadcast spectrum alone (not including the value of being an NBC affiliate) in the FCC's upcoming spectrum auction is initially valued at more than $454 million.

95.     As a cable programming network, NECN has no ability to broadcast free over-the-air NBC news or other NBC network programming as required under the Affiliate Agreement, the FCC Order, and the Public Interest Statement.  WHDH understood that Comcast was, therefore, shopping around for an over-the-air signal that could satisfy its legal obligations to continue over-the-air access to the Boston market.

96.     WHDH declined the September 14, 2015 offer.

97.     WHDH again met with representatives of Comcast on November 13, 2015, seeking an explanation for its decision to terminate their long-term, highly successful relationship and a reconsideration of that decision.  WHDH explained that Comcast's decision simply did not make sense from a broadcasting perspective given the structure of the Boston market and WHDH's position in it.  In response, Ted Harbert stated that the decision was based upon "all of the assets" Comcast owned in the market.  Valari Staab agreed that the decision would not make sense if limited to broadcast, but that building its own affiliate in Boston would enable Comcast to "leverage" its extensive cable assets in Boston.  The Comcast executives acknowledged that, given the time it takes to build an affiliate from scratch and develop a

credible local presence, it would take ten years to determine whether Comcast's "experiment" in Boston would work.

98.     At the November 13, 2015 meeting, Comcast—still in need of over-the-air broadcast capability in Boston to meet its obligations—proposed to WHDH a channel sharing arrangement whereby its new Boston affiliate would broadcast over the air to the Boston area by sharing WHDH's broadcast spectrum.  Comcast followed on December 7, 2015 with a written proposal under which it would pay WHDH $75 million to share its broadcast spectrum.

99.     WHDH declined this proposal, explaining to Comcast that Comcast's actions constituted a violation of the Affiliate Agreement.  WHDH also identified to Comcast other legal impediments to its plan due to the excessive concentration of Comcast media control in the Boston area that would result.

100.     Comcast responded that there was  no "legal impediment" to its proposed plan.

101.     On January 7, 2016, having failed to purchase the WHDH broadcast signal at a fire sale price, Comcast publicly announced that it would not renew its affiliate relationship with WHDH at the end of 2016, but would launch an owned-and-operated NBC affiliate in Boston on January 1, 2017, using NECN and broadcasting over the air from a small Comcast-owned Telemundo station, WNEU, out of Merrimack, New Hampshire.

**Comcast's Actions in Boston Are Driven by Its Cable Interests to the Detriment of Its Broadcast Presence in Violation of Regulatory and Contractual Commitments**

102.     Comcast acknowledged in connection with its 2011 acquisition of NBC that its vast cable assets dwarfed NBC's content assets and would drive the profitability of the combined entity.

103.     As set forth in paragraph 97, Comcast executives recently acknowledged to WHDH that Comcast's actions in Boston are (1) based upon its intention to leverage its cable

dominance using the NBC network programming, and (2) would not make sense purely from a broadcasting perspective.

104.    These acknowledgements reflect the well-recognized reality in the broadcast industry that it is very difficult to build a local affiliate from the ground up as Comcast plans to do in Boston, because it takes years for a new station to build relationships with viewers, advertisers, and the community at large.  This is why no network has attempted to build its own broadcast affiliate from the ground up in a major market.  The fact that Comcast has a highly successful existing affiliate in Boston makes the decision even more suspect.

105.    Comcast's plan will reduce NBC's local ratings and the profitability of its broadcast operations for a significant period of time.

106.    Comcast's plan to bypass its longstanding Boston affiliate so that it can leverage its dominant cable programming and distribution assets here is aimed at increasing its already dominant positions in the markets for the delivery of commercial television programming and local spot advertising in Boston, as described in paragraphs 119-148, below.

**Comcast's Plan Will Deprive Millions of Greater Boston Residents—Including Many Economically Disadvantaged, Primarily Minority Communities—of the Option of Free, Over-the-Air Access to NBC Programming in Violation of Comcast's Contractual and Regulatory Commitments**

107.    According to Comcast's January 7, 2016 announcement, while NBC programming will be broadcast via cable on NECN beginning in 2017, the WNEU station will broadcast two channels from its one New Hampshire transmitter: Comcast's new Boston affiliate and its existing Spanish-language Telemundo channel.

108.    Transmitting out of Merrimack, New Hampshire, the WNEU signal is not powerful enough to reach the entire Boston DMA.  Indeed, based upon FCC data from 2012, it reaches only about 3,215,393 of the 7,126,294 viewers currently reached by WHDH's signal,

excluding current viewers located in Boston's southern neighborhoods and towns south and west of the city, as depicted in the diagram below.



109.    The harm to these viewers of losing free, over-the-air access to NBC programming is very real, which is why the NBC Affiliates and the FCC took such pains to protect it.  According the National Association of Broadcasters, over-the-air broadcast television is the primary video programming delivery method for over 19% of U.S. television households, representing over 59 million consumers.

110.    Within Boston alone, hundreds of thousands of viewers rely primarily on over-the-air broadcasting to receive television programming.

111.    These figures understate the public's actual reliance on over-the-air broadcasting because many households subscribe to cable, but only for some of the multiple television receivers in any given household.  Many households have additional televisions that only receive

over-the-air broadcasts. These households, although counted as cable subscribers, still significantly rely on free, over-the-air broadcasting.

112.    Eliminating over-the-air access has a disproportionate impact on low-income families and racial and ethnic minorities, which are more dependent upon free, over-the-air access than other groups.

113.    According to the 2014 American Community Survey (U.S. Census Bureau), nearly 30% of Boston residents are living in households with incomes below the federal poverty level of around $25,000. These Boston residents face the added challenge of living below the poverty line in a cold-weather city ranked as the seventh most expensive city in the United States. There is a high concentration of low income families in communities that will lose free over-the-air access to NBC programming as a result of Comcast's actions, including Roxbury, Dorchester, Mattapan, Brockton, Fall River, New Bedford and Worcester.

114.    Those neighborhoods have significant minority populations. Nationally, minority groups make up 41% of all broadcast-only households.

115.    With the average cost of cable service exceeding $100 per month, these families will have to expend a significant portion of their income to maintain access to NBC programming.

116.    In addition, Comcast's actions will deter a competitive threat it has increasingly faced. Recently there has been a significant increase in "cord-cutting" among viewers, i.e., consumers trending away from bundled paid cable service and toward "self-bundling" their own programming through a combination of free, over-the-air broadcasting and online television programming accessed through the internet. By eliminating the over-the-air option for NBC

programming for nearly four million viewers, Comcast will erect a substantial barrier to this competitive threat.

117.    Because Comcast is the predominant cable provider for most of the nearly four million viewers who will lose over-the-air access to NBC programming, the primary option for those wishing to continue viewing NBC programming will be to pay Comcast for cable access. Comcast's dominance in the Boston cable market is illustrated by the diagram below.



118.    Comcast's broadcast plan violates its over-the-air commitments contained in the Affiliate Agreement, the restrictions imposed upon Comcast by the FCC, and the Public Interest Statement to the FCC.

### Relevant Geographic Market

119.    The relevant geographic market is the Boston DMA as determined by The Nielsen Company, based primarily on its measurement of local viewing patterns.   This includes the following counties in Massachusetts:   Barnstable, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, Suffolk, and Worcester.   It also includes Windham County, Vermont and the following counties in New Hampshire: Belknap, Cheshire, Hillsboro, Merrimack, Rockingham, and Strafford.

### Relevant Product Markets

*Delivery of Commercial Television Programming*

120.    WHDH and Comcast compete in the market for the delivery of commercial television programming in the Boston DMA.   WHDH currently transmits NBC programming over the air, and Comcast distributes television programming on over one hundred channels through Comcast's wholly-owned local Xfinity cable services.   The other over-the-air broadcasters in the Boston DMA are WCVB, which transmits ABC programming over the air; WBZ, which transmits CBS programming over the air; WFXT, which transmits FOX programming over the air; and a few local and PBS stations.   Other companies, including Verizon, RCN, Charter, and the DISH Network also participate in the market for the delivery of commercial television programming in the Boston DMA.

121.    The vast majority of television programming in the Boston DMA is through cable television programming.   On information and belief, Comcast transmits cable television programming to nearly 85% of the cable subscribers in the Boston DMA.

122.    WHDH transmits NBC programming over the air and, on information and belief, represents roughly 26% (measured by revenue) of all over-the-air transmissions in the Boston DMA.

123.    The market for the delivery of commercial television programming in the Boston DMA is characterized by limited cross elasticities of demand with other products.  Consumers could not readily turn to alternatives.  There are no reasonable substitutes for the delivery of commercial television programming in the Boston DMA.

*Local Spot Advertising*

124.    Comcast and WHDH also compete in the market for local spot advertising in the Boston DMA.  Spot advertising gives marketers (including, for example, local politicians and businesses) the ability to purchase television advertising time in a specific geographic area, rather than buying advertising on a national scale.  WHDH sells local spot advertising.  WHDH is also a purchaser in this market, as it creates advertisements to promote its station and purchases advertising time from other stations.  Comcast sells local spot advertising through its ownership of over twenty cable and over-the-air television stations and its ownership of Comcast Spotlight, an advertising sales interconnect company that sells local advertising slots for over fifty cable networks.

125.    An "interconnect" is a group of two or more wired-cable systems within a DMA handled by the same advertising sales entity.  In the Boston DMA, Comcast owns the only interconnect, known as Comcast Spotlight Boston, which groups together multiple cable systems.  With respect to any of the cable systems in this interconnect, if an advertiser wants to purchase local spot advertising to be aired during any programming or wants to target a specific subscriber base, the advertiser must purchase such advertising through Comcast Spotlight.

126.    Comcast reports that Comcast Spotlight Boston has the fifth highest cable penetration percentage in the entire country, controlling 81.6% of the cable advertisements in the Boston DMA.  *See* https://www.comcastspotlight.com/markets/boston.

127.    According to Comcast, 96% of all cable households in the Boston DMA are covered by Comcast Spotlight Boston.  *Id.*  In other words, 96% of all Boston's cable purchasers view advertising that is curated and sold by Comcast, with advertising prices set by Comcast.

128.    The vast majority of local spot advertisements in the Boston DMA are on cable channels.  The same local spot advertisements may also be transmitted on over-the-air television stations such as WHDH.

129.    The spot advertising market is characterized by high barriers to competitive entry and expansion as well as limited cross elasticities of demand with other products.  Purchasers could not readily turn to alternatives.  Other local forms of advertising are not reasonable substitutes for television advertising.  Moreover, sales of national and broader regional spot advertisements are also not reasonable substitutes for local spot advertising.

**Comcast's Plan Will Harm Competition**

130.    When the 2011 Comcast/NBC transaction was being reviewed by the FCC and the DOJ, many of the concerns raised—particularly those related to imbalanced market power— highlighted the potential risk in geographic markets where Comcast held a significant share of the cable households.

131.    Even before the January 7, 2016 announcement of the Comcast scheme, Comcast's dominance in the Boston DMA was obvious.  For example, Comcast serves nearly 85% of all cable subscribers in the Boston DMA through its Xfinity cable services, and has

controlling ownership in the Comcast Spotlight interconnect, Comcast SportsNet, and over twenty cable programming networks in the Boston DMA.

132.    The Wall Street Journal has reported that the DOJ's Antitrust Division is currently investigating Comcast in connection with questions over whether Comcast's advertising sales practices are hindering competition.  Reportedly, the investigation is focused on monopolization of the spot advertising market in locations where Comcast offers services, like the Boston DMA. Shalini Ramachandran & Brent Kendall, *Comcast Faces DOJ Probe*, Wall St. J., Nov. 25, 2015, at B1.

133.    The Comcast plan to move the NBC broadcast in the Boston DMA onto a cable distribution platform and a limited over-the-air station—both of which are owned by Comcast— will materially increase Comcast's already high concentration in the Boston DMA.

134.    By giving Comcast increased market power in the Boston market for the delivery of commercial television programming and the Boston market for local spot advertising, competition in those markets will be hindered.

135.    In the market for the delivery of commercial television programming in the Boston DMA, Comcast will have significant and increased control.  It will be able to charge higher prices to cable subscribers, to advertising purchasers, and to competitor cable and satellite companies that wish to re-transmit the local NBC signal through their services.

136.    In light of Comcast's refusal to deal in good faith with WHDH, consumers of free, over-the-air broadcast television in the Boston DMA will have fewer options.  Indeed, many of them will have no free access to the NBC network broadcast at all.

137.    In the local spot advertising market, the price of advertising is driven by ratings points, i.e., the percentage of households viewing a particular program in a particular DMA.  If a

particular program has high ratings points, it will be able to command a higher price for advertisements airing during the program.

138.    Comcast controls 81.6% of the cable spot advertising inventory, but it currently holds a disproportionately smaller share of the total ratings points available because the vast majority of the programming carried on the channels it controls through Comcast Spotlight are not highly viewed and do not generate significant ratings points.  In contrast, advertising spots on NBC's marquee programming, which includes the Olympics, Sunday Night Football, the Super Bowl, and other NBC programming, generate significant ratings and therefore are highly coveted by advertisers.

139.    By taking over the NBC network broadcast in Boston and combining all of its existing programming and distribution assets, Comcast will increase its control of the local spot advertising inventory and significantly increase its share of total ratings points in the Boston DMA, materially increasing its market power and corresponding leverage in the spot advertising market

140.    In addition, sellers of spot advertising, including WHDH, will be forced to sell at the prices commanded by Comcast rather than competitive prices.

141.    Comcast is harming the competitive process in the Boston DMA by frustrating consumer preferences and erecting barriers to competition, particularly in the markets for the delivery of commercial television programming and the spot advertising market.

142.    Comcast is also thwarting the purpose of the conditions set forth in the FCC Memorandum and Order allowing the Comcast/NBC transaction to proceed.  Comcast is threatening to harm and, if allowed to proceed with its current plan in the Boston DMA, will harm competition, innovation, and consumer welfare in the Boston DMA.

**Comcast Is Terminating Its Long-Term, Highly Profitable Relationship with
WHDH and Will Experience Reduced Profitability in Order to Pursue its Anticompetitive
Goals**

143.    Comcast and its predecessors have engaged in a profitable course of dealing with WHDH for over two decades, wherein Comcast and its predecessors and subsidiaries elected to license the right to broadcast NBC programming to WHDH rather than invest in and operate their own station in the Boston DMA.

144.    Comcast has informed WHDH that Comcast is unilaterally terminating that prior voluntary course of conduct and is unwilling to negotiate to renew that course of conduct regardless of whether WHDH offers amounts that are the same or greater than other NBC affiliates pay.

145.    Upon information and belief, Comcast will have to invest millions of dollars to provide NBC programming to the Boston DMA and is forsaking short-term profits that it would receive from continuing the prior course of conduct with WHDH.

146.    Upon information and belief, even after investing millions of dollars to provide NBC programming to the Boston DMA, Comcast will not be able to provide over-the-air access to all of the Boston DMA.

147.    Upon information and belief, Comcast's decision is designed to eliminate competition in the Boston DMA to allow Comcast to gain monopoly power in the market for the delivery of commercial television programming in the Boston DMA as well as market power in the spot advertising market, and to extract supracompetitive prices in those markets.

148.    Upon information and belief, said conduct by Comcast is being carried out with a purpose and intent of foreclosing and eliminating WHDH from a substantial portion of the relevant markets.

**Comcast's Behavior Will Cause Significant and Irreparable Harm to WHDH**

149.    Comcast's anticompetitive behavior, its breach of the Affiliate Agreement, and its violation of M.G.L. ch. 93A, have caused and will continue to cause irreparable harm to WHDH, as described in detail below.

150.    WHDH will suffer substantial injury that is not accurately measurable or adequately compensable through monetary damages.  WHDH will suffer from a loss of revenue and the imposition of additional costs, neither of which are readily calculable; harm to its goodwill and damage to its reputation; loss of its prestigious brand; a loss of market share and permanent loss of customers.

151.    Comcast's actions are causing and will cause loss of WHDH revenues and profits that are not readily calculable.  As an unaffiliated station, WHDH will suffer a significant loss in ratings points.  The loss in ratings points will reduce the prices WHDH  will be able to charge for spot advertising.  Given reduced ratings points, some advertisers may also take their business elsewhere.  The precise impact of Comcast's actions on WHDH's ratings points and advertising revenues is driven entirely by future market dynamics that cannot now be fully predicted.

152.    As an unaffiliated station, WHDH expects it will lose at least a portion of its retransmission revenue.  Cable companies, including Comcast, that currently pay WHDH retransmission fees will seek to obtain WHDH content for lower retransmission fees.  At present, WHDH cannot calculate with precision the retransmission revenues that will be lost because that amount will be determined by future market dynamics that cannot now be fully predicted.

153.    Without NBC programming, WHDH will lose revenue that it currently obtains by selling "premium" advertising slots during premium NBC programming, including NFL football games, the Olympics, and prime time NBC programming.  These types of programming, which

garner high ratings points, drive substantial sales revenues for WHDH.  Because future ratings points and advertising sales in a newly-configured market are subject to future market dynamics that cannot now be predicted with certainty, WHDH cannot currently determine precisely how much revenue it will lose when it is no longer able to sell these "premium" advertising slots.

154.    As an unaffiliated station, WHDH will suffer revenue and customer loss as a result of losing NBC "audience flow."   Some viewers tune in to WHDH to watch NBC programming and watch WHDH programming that airs either before or after the NBC programming.  Without the NBC affiliation, WHDH will lose the benefit of this audience flow.  At present, WHDH cannot precisely calculate the value of lost revenue and customers due to lost audience flow, as these calculations are driven by future market dynamics that cannot fully be predicted.

155.    In addition to severely reducing WHDH's revenues, Comcast's actions will cause WHDH to incur significant additional costs that are not now readily calculable:

    a.    WHDH will incur added expenses in the purchase of local spot advertisements in marketing and promoting its non-NBC affiliated television station through Comcast;

    b.    WHDH will be forced to expend additional funds to purchase programming to fill the time slots left empty by the loss of NBC programming;

    c.    WHDH will be forced to produce more hours of news and other programming to fill the time slots left empty by the loss of NBC programming.   The costs to produce more hours of news and programming include, at a minimum:  (1) production costs; (2) payment of

salary and benefits to additional, new employees, including on-air talent, reporters, writers, producers, and editors; and (3) payment of additional salary and benefits to existing employees who will be asked to provide additional time and/or labor to WHDH;

d.     WHDH will also have to pay existing staff members higher salaries in order to stave off aggressive employment offers from Comcast. Particularly in the television news industry, where on-air talent provides a unique service as the "face" of the station, WHDH presently cannot put a value on the loss of certain employees or the amount of money it will have to expend to retain certain employees;

e.     WHDH will incur the business expenses of renegotiating retransmission relationships with cable companies (including Comcast) and rebranding itself as a non-affiliated station; and

f.     Without the affiliation with NBC, WHDH will bear the entire cost of certain news-gathering expenses currently shared with NBC.

156.   Comcast's actions are causing and will continue to cause harm to WHDH's goodwill and damage to its reputation.  WHDH has spent more than two decades investing hundreds of millions of dollars in building a first-rate local television and news station, built—at least in part—with the NBC affiliation as an anchor.  WHDH has developed, over the course of time, a viewing audience that relies on WHDH to deliver NBC and WHDH-produced broadcasting.  If WHDH becomes an unaffiliated station, WHDH's hard-won goodwill and reputation in the Boston DMA will be irreparably injured, and WHDH will suffer from diminished visibility and public presence.

157. Comcast's actions in terminating WHDH's long-standing affiliation with NBC will irreparably harm WHDH's prestigious brand. WHDH will not be able to continue to provide the unique programming that the public has come to expect from WHDH; nor will WHDH be able to obtain the unique programming provided by NBC from any other source.

158. Comcast's actions will cause WHDH to suffer the permanent loss of customers. If WHDH is no longer affiliated with NBC, advertisers are likely to either stop or substantially reduce their advertising spend with WHDH. Moreover, viewers who seek out NBC programming will be less likely to tune in to WHDH. At this time WHDH cannot predict exactly how many advertisers and viewers it will lose as a result of Comcast's actions.

## COUNT I: BREACH OF CONTRACT

159. WHDH incorporates the allegations contained in paragraphs 1 through 158 above as if set forth fully herein.

160. WHDH is an intended third-party beneficiary of the Affiliate Agreement.

161. Comcast has breached and will continue to breach the Affiliate Agreement by: refusing to engage in a cooperative dialogue with WHDH concerning an extension of the NBC broadcast affiliation license; failing to maintain free, over-the-air access to NBC programming in the entire Boston DMA; migrating major sporting events to a linear programming channel owned by Comcast; and discriminating against WHDH in its broadcast affiliation negotiations based upon Comcast's cable interests.

162. As a result of Comcast's breaches of the Affiliate Agreement, WHDH has suffered and will suffer substantial damages and harm, including irreparable harm, as described herein.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

163.    WHDH incorporates the allegations contained in paragraphs 1 through 162 above as if set forth fully herein.

164.    A covenant of good faith and fair dealing attaches to the Affiliate Agreement by operation of law.

165.    WHDH is an intended third-party beneficiary of the Affiliate Agreement.

166.    Comcast has breached and will continue to breach its obligations of good faith and fair dealing under the Affiliate Agreement.

167.    As a result of Comcast's breaches of the covenant of good faith and fair dealing, WHDH has suffered and will suffer substantial damages and harm, including irreparable harm, as described herein.

## COUNT III: VIOLATION OF M.G.L.  ch. 93A, §§ 2 & 11

168.    WHDH incorporates the allegations contained in paragraphs 1 through 167 above as if set forth fully herein.

169.    Comcast is engaged in the conduct of trade or commerce within the meaning of M.G.L. ch. 93A §§ 1, 2, and 11.

170.    As described herein, Comcast has engaged and will continue to engage in unfair methods of competition and committed unfair and/or deceptive acts in violation of M.G.L. ch. 93A §§ 2 and 11, including by:

   a.    Combining Comcast with NBC in a transaction that gave rise to market power, promising not to exercise that market power, and then exercising market power in violation of the promises;

   b.    Violating the FCC's Memorandum Opinion and Order;

48

    c.       Unfairly refusing to deal with WHDH for a monopolistic purpose;

    d.       Violating the Affiliate Agreement;

    e.       Engaging in sham negotiations to extend the WHDH/NBC affiliation;

    f.       Violating the implied covenant of good faith and fair dealing; and

    g.       Violating state and federal antitrust laws.

171.    The acts complained of herein occurred primarily and substantially in Massachusetts.

172.    Comcast's violations of M.G.L. ch. 93A were and are willful and intentional.

173.    As a result of Comcast's violations of M.G.L. ch. 93A, WHDH has suffered and will suffer substantial damages and harm, including irreparable harm, as described herein.

### COUNT IV: VIOLATION OF SHERMAN ACT SECTION 2: MONOPOLIZATION

174.    WHDH incorporates the allegations contained in paragraphs 1 through 173 above as if set forth fully herein.

175.    At all times relevant herein, Comcast has willfully acquired and/or maintained monopoly power in the Boston market for the delivery of commercial television programming, and has exercised that power so as to harm competition in the Boston market for local spot advertising. Comcast has and will continue to improperly and illegally acquire and/or maintain that monopoly power by a course of exclusionary conduct, in violation of Section 2 of the Sherman Act, including but not limited to:

    a.       Combining Comcast and NBC in a transaction that gives rise to market power, promising not to exercise that market power, and then exercising that market power in violation of the promises;

    b.       Refusing to deal with WHDH in providing a local over-the-air NBC signal

to the entire Boston DMA;

c.      Preparing to transmit NBC programming in the Boston DMA on NECN, a cable station that Comcast owns, and on WNEU, an over-the-air station that does not reach the entire Boston DMA and which Comcast also owns;

d.      Curtailing competition between Comcast and WHDH in the delivery of commercial television programming market and the local spot advertising market; and

e.      Increasing its control over the delivery of commercial television programming market and the local spot advertising market such that it will be able to charge prices above the competitive level.

176.      Upon information and belief, said conduct by Comcast was carried out with the purpose and intent of foreclosing and eliminating WHDH as a competitor and charging monopoly pricing to all purchasers in the relevant markets in the Boston DMA, including WHDH.

177.      There is no pro-competitive justification for Comcast's actions.

178.      As a consequence of the foregoing, competition will be harmed as set forth above.

179.      As a result of Comcast's violations of Section 2 of the Sherman Act, WHDH has suffered and will suffer substantial damages and harm, including irreparable harm as described herein.

## COUNT V: VIOLATION OF SHERMAN ACT SECTION 2: ATTEMPTED MONOPOLIZATION

180.      WHDH incorporates the allegations contained in paragraphs 1 through 179 above as if set forth fully herein.

181.    Comcast is attempting to monopolize the market for delivery of commercial television programming, and to exercise that power so as to harm competition in the local spot advertising market in the Boston DMA.

182.    By virtue of (1) Comcast's demonstrated ability to exclude competition, including WHDH, (2) Comcast's already dominant market share, and (3) the high barriers to competitive entry and expansion, Comcast has a dangerous probability of success in achieving monopoly power in the delivery of commercial television in the Boston DMA in violation of Section 2 of the Sherman Act.

183.    Upon information and belief, said conduct by Comcast was carried out with the purpose and intent of foreclosing and eliminating WHDH from a substantial portion of the relevant markets in the Boston DMA.

184.    There is no pro-competitive justification for Comcast's actions.

185.    As a consequence of the foregoing, competition will be harmed as set forth above.

186.    As a result of Comcast's violations of Section 2 of the Sherman Act, WHDH has suffered and will suffer substantial damages and harm, including irreparable harm as described herein.

## COUNT VI: VIOLATION OF MASSACHUSETTS ANTITRUST ACT (M.G.L. ch. 93): MONOPOLIZATION

187.    WHDH incorporates the allegations contained in paragraphs 1 through 186 above as if set forth fully herein.

188.    At all times relevant herein, Comcast has willfully acquired and/or maintained monopoly power in the Boston market for the delivery of commercial television programming, and has exercised that power so as to harm competition in the in the Boston market for local spot advertising.

189.    Comcast has and will continue to improperly and illegally acquire and/or maintain that monopoly power by a course of exclusionary conduct, in violation of M.G.L. ch. 93, § 1 *et seq.*, including but not limited to:

a.    Combining Comcast with NBC in a transaction that give rise to market power, promising not to exercise that market power, and then exercising that market power in violation of its promise;

b.    Refusing to deal with WHDH in providing a local over-the-air NBC signal to the entire Boston DMA;

c.    Preparing to transmit NBC programming in the Boston DMA on NECN, a cable station that Comcast owns, and on WNEU, an over-the-air station that does not reach the entire Boston DMA and which Comcast also owns;

d.    Curtailing competition between Comcast and WHDH in the delivery of commercial television programming market and the local spot advertising market; and

e.    Increasing its control over the delivery of commercial television programming market and the local spot advertising market such that it will be able to charge supracompetitive prices.

190.    Upon information and belief, said conduct by Comcast was carried out with the purpose and intent of foreclosing and eliminating WHDH as a competitor and charging prices above the competitive level to all purchasers in the relevant markets in the Boston DMA, including WHDH.

191.    There is no pro-competitive justification for Comcast's actions.

192.    As a consequence of the foregoing, competition will be harmed as set forth above.

193.    The acts complained of herein have their competitive impact primarily and predominantly within Massachusetts.

194.    As a result of Comcast's violations of M.G.L. ch. 93, WHDH has suffered and will suffer substantial damages and harm, including irreparable harm as described herein.

### COUNT VII:  VIOLATION OF MASSACHUSETTS ANTITRUST ACT (M.G.L. ch. 93): ATTEMPTED MONOPOLIZATION

195.    WHDH incorporates the allegations contained in paragraphs 1 through 194 above as if set forth fully herein.

196.    Comcast is attempting to monopolize the market for delivery of commercial television programming in the Boston DMA, and to harm competition in the local spot advertising market in the Boston DMA.

197.    By virtue of (1) Comcast's demonstrated ability to exclude competition, including WHDH, (2) Comcast's already dominant market share, and (3) the high barriers to competitive entry and expansion, Comcast has a dangerous probability of success in achieving monopoly power in the delivery of commercial television programming in the Boston DMA in violation of M.G.L. ch. 93, § 1 *et seq.*

198.    Upon information and belief, said conduct by Comcast was carried out with the purpose and intent of foreclosing and eliminating WHDH from a substantial portion of the relevant markets in the Boston DMA.

199.    There is no pro-competitive justification for Comcast's actions.

200.    As a consequence of the foregoing, competition will be harmed as set forth above.

201.    The acts complained of herein have their competitive impact primarily and predominantly within Massachusetts.

202.    As a result of Comcast's violations of M.G.L. ch. 93, WHDH has suffered and will suffer substantial damages and harm, including irreparable harm as described herein.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff WHDH prays that the Court issue the following relief:

A.      Issue a preliminary injunction preserving the status quo pending a final resolution of WHDH's claims on the merits;

B.      Enter judgment against Comcast on Counts I-VII of the Complaint;

C.      If and to the extent the Court determines that any of WHDH's claims herein are not yet ripe, determine that a case or controversy currently exists with respect to such claim(s) and issue a declaration of the rights of the parties with respect thereto;

D.      Order Comcast to pay WHDH actual or statutory damages in amounts to be determined at trial;

E.      Order Comcast to pay WHDH's reasonable costs and attorneys' fees, as well as prejudgment interest incurred in prosecuting this action;

F.      Order Comcast to pay WHDH treble damages pursuant to M.G.L. ch. 93A and 15 U.S.C. § 15(a); and

G.      Grant such other legal and/or equitable relief as is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff WHDH hereby demands a trial by jury on all issues and claims so triable.

Respectfully submitted,

WHDH-TV

By its attorneys

__/s/ Michael T. Gass_____
Michael T. Gass (BBO No. 546874)
John A. Nadas (BBO No. 366200)
Robert M. Buchanan, Jr. (BBO No. 545910)
Anita Spieth (BBO No. 676302)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tel:  (617) 248-5000
Fax:  (617) 248-4000
mgass@choate.com
jnadas@choate.com
rbuchanan@choate.com
aspieth@choate.com

March 10, 2016