UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-10494-RGS

WHDH-TV

v.

COMCAST CORP.

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION TO DISMISS

May 16, 2016

STEARNS, D.J.

This case raises the issue of whether, and if so, how, a court can order an unwilling supplier to renew a contract with a long-term distributor whose services it no longer wants or needs.  WHDH-TV, an independently owned NBC affiliate station serving the Boston area, alleges that Comcast Corporation, the media conglomerate that acquired NBC in 2011, engaged in unfair, deceptive, and anticompetitive practices when it refused to negotiate a renewal of WHDH's affiliation contract.  Comcast moves to dismiss the Complaint for failure to assert a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The court heard oral argument on May 12, 2016.[1]

_____

[1] Although a relatively brief time has elapsed since the hearing, the court would not want this decision to be deemed a rush to judgment.  The court has been aware from the time the Complaint was filed that this matter

## BACKGROUND[2]

Broadcast television is licensed and regulated by the Federal Communications Commission (FCC).   Under the Communications Act of 1934, television broadcasters are required to operate in the "public interest, convenience, and necessity."   47 U.S.C. § 310(d); Compl. ¶ 29; *see also* 47 U.S.C. § 214(a).   Consistent with this mandate, over-the-air broadcasters have statutory and regulatory obligations to air content that is responsive to the community they serve.  Compl. ¶ 29.  Affiliate stations fulfill their public service obligations by providing free over-the-air access to the network's regular entertainment, news, and sports programs, as well as community tailored content including news, weather reports, traffic bulletins, public affairs and public emergency announcements, and special coverage of local political races, high school sports events, and community activities.  *Id.* ¶¶ 30-31.  WHDH has been a top-performing and award-winning NBC affiliate station since 1995.  *Id.* ¶¶ 34-43.  WHDH's free over-the-air programming is available to more than 7 million viewers in southern New England.  *Id.* ¶ 45.

---

is time sensitive because "WHDH will cease to be an NBC affiliate on January 1, 2017."  Dkt. # 3 (WHDH's Motion to Expedite).  Consequently, the court has studied the pleadings as they have been filed.  Any remaining questions were resolved at the very thorough and informative May 12 hearing.

[2] The well-pled and plausible facts of the Complaint are accepted as true for purposes of evaluating a motion to dismiss.

Cable networks, on the other hand, are not subject to the same community service requirements that apply to broadcast stations. *Id.* ¶ 32. Cable networks compete with broadcast stations for viewers and have an economic incentive to supplant free over-the-air content with subscription-based programming. *Id.* Comcast is the largest cable subscription company in the world. *Id.* ¶ 9.

In 2009, Comcast announced its intention to acquire a controlling interest in NBC from its then owner, General Electric (GE). *Id.* ¶ 49. Because the acquisition would result in an unprecedented concentration of media services, the merger required the approval of the FCC and the Department of Justice. *Id.* During the public comment period, various groups, including NBC affiliate stations, expressed the concern that the acquisition would have an anticompetitive effect, particularly in markets like Boston, where, as the dominant cable provider, Comcast might be tempted to subordinate the public interest served by local NBC broadcast affiliates to its more lucrative cable business. *Id.* ¶¶ 50-54.

To assuage these concerns, in January of 2010, Comcast, GE, and NBC filed a Public Interest Statement with the FCC to "publicly affirm[] their continuing commitment to free, over-the-air broadcasting." *Id.* ¶¶ 71-72. The parties represented to the FCC that "local broadcast affiliates [would]

3

benefit by having the full support of Comcast, a company that is focused entirely on entertainment, information, and communications and that has strong incentives – and the ability – to invest in and grow the broadcast businesses it is acquiring, in partnership with the local affiliates." *Id.* ¶ 73. The triad explained that "the transaction places the ownership of NBCU [(NBC Universal)]'s free over-the-air broadcast businesses into a joint venture that will have greater incentives to grow and strengthen these businesses, to the benefit of the company, its broadcast affiliates, and consumers." *Id.* They also put forward sixteen voluntary commitments that would become binding on Comcast upon completion of the merger. *Id.* ¶ 71. At the core of these commitments was

> Commitment # 1: The combined entity remains committed to continuing to provide free over-the-air television through its O&O [(owned-and-operated)] broadcast stations and through local broadcast affiliates across the nation.  As Comcast negotiates and renews agreements with its broadcast affiliates, Comcast will continue its cooperative dialogue with its affiliates toward a business model to sustain free over-the-air service that can be workable in the evolving economic and technological environment.

*Id.* ¶ 73.

To overcome any lingering resistance on the part of the NBC affiliate stations, Comcast negotiated an "Agreement" with the NBC Television Affiliates Association (NBCTAA), the trade organization representing the

4

affiliates' interests. *Id.* ¶¶ 55-60; *see* Compl. - Ex. A (the NBCTAA Agreement). Among other terms, the Agreement incorporated Commitment #1 of the Public Interest Statement. *See id.* at 1. "In furtherance of this commitment, Comcast will, for a period of ten (10) years after consummation of the Transaction: [] Maintain the Network – as made available for broadcast over the air by the Network's broadcast television affiliates – as a premier general entertainment programming service . . . ." *Id.* After the execution of the Agreement, the NBCTAA submitted a public comment supporting the acquisition. Compl. ¶ 70.

In January of 2011, the FCC approved the merger subject to a series of "remedial conditions to address potential harms likely to result from the transaction." *Id.* ¶ 75; FCC Approval Order (https://transition.fcc.gov/FCC-11-4.pdf, last accessed May 16, 2016) at 3-4; 118-144. The FCC Approval Order also incorporated Sections 2, 3, and 7 of the Agreement between Comcast and the NBCTAA.[3] Compl. ¶ 77, FCC Order at 68-69, 134. Comcast

---

[3] In Section 2, Comcast agreed not to migrate the telecast of major sporting events (such as the Olympics) from broadcast to cable stations. Compl. - Ex. A. at 2-3. In Section 3, Comcast agreed that NBC "will remain solely responsible for negotiating network affiliation agreements with NBC Local Affiliates" and the negotiations will be conducted "separate from, and without [being] influence[d]" by Comcast's cable interests. *Id.* at 3-4. In Section 7, Comcast agreed to honor NBC's agreements and side letters with affiliate stations and ratify other measures maintaining affiliate market integrity. *Id.* at 4-5.

became the majority owner of NBC on January 18, 2011, and acquired the remainder of GE's interest in NBC in March of 2013. Compl. ¶ 81.

WHDH's affiliate contract with NBC (entered in 1995) expires on January 1, 2017. *Id.* ¶¶ 34, 42. Beginning in 2013, WHDH made repeated overtures to Comcast to begin the renewal discussions. *Id.* ¶ 88. Comcast told WHDH several times that it was not ready to negotiate because of the uncertainty in the retransmission market,[4] and wanted to defer any decision until the expiration date of WHDH's current contract drew nearer. *Id.*

In July of 2013, Comcast transferred NECN, a regional Boston cable news channel that it long owned, from the cable side of its business to the NBC broadcast side. *Id.* ¶ 84. NECN sales representatives reportedly began informing major advertisers in the Boston area that NECN would take over as the local NBC broadcast affiliate beginning in January of 2017. *Id.* ¶ 85. When WHDH queried Comcast about the reports, Comcast dismissed the "rumors" and assured WHDH that it intended to eventually open negotiations. *Id.* ¶ 86. During 2014 and 2015, Comcast built a new, state-of-the-art broadcast studio for NECN, updated others of NECN's facilities and

---

[4] The retransmission market refers to the payment of fees by cable companies to broadcasters for the right to retransmit the broadcast signals over cable.

equipment, and hired an experienced news management team to oversee the station.  *Id.* ¶ 90.

On September 11, 2015, Comcast informed WHDH that it would not renew the affiliate contract and intended to replace WHDH with a Comcast-owned start-up station based at NECN's new facility.  *Id.* ¶ 91.  The following week, Comcast offered to purchase WHDH's assets (which WHDH values at $500 million[5]) for $200 million.  *Id.* ¶ 94.  Comcast acknowledged that its offer reflected a diminished valuation of WHDH because of the impending termination of WHDH's NBC affiliation.  *Id.*  WHDH refused the offer.  *Id.* ¶ 96.

On November 13, 2015, WHDH leadership met with Comcast executives, seeking an explanation for the refusal to negotiate a renewal of the affiliation agreement.  *Id.* ¶ 97.  Comcast acknowledged that its decision to create an owner-operated affiliate in Boston might not appear to make business sense from a perspective limited to the broadcast market, but that

---

[5] WHDH claims that its broadcast spectrum alone has a fair market value of over $454 million.  By way of background, a spectrum license is required for over-the-air broadcasting.  The license permits the holder to broadcast on a specific radio frequency in a defined geographic area.  From time to time, the FCC conducts auctions of broadcast spectrums.  *See id.* ¶ 94.

it wanted to "leverage" "all of the assets" that it owned in the Boston area.  *Id.*
Comcast also characterized its decision as an "experiment."  *Id.*

At the same meeting, Comcast offered WHDH $75 million as a fee for
sharing WHDH's broadcast spectrum.  *Id.* ¶ 98.  WHDH declined the offer.
*Id.* ¶ 99.  In January of 2016, Comcast publicly announced the plan to launch
an owner-operated NBC affiliate in Boston, broadcasting through a Comcast-
owned Telemundo station, WNEU, based in Merrimack, New Hampshire.
*Id.* ¶ 101.  According to WHDH, the signal from WNEU will reach only some
3.2 million of WHDH's 7.1 million person broadcast audience, leaving many
viewers in towns and cities south of Boston without access to free over-the-
air NBC programming.  *Id.* ¶ 108.

WHDH filed this Complaint in March of 2016.  The Complaint alleges
breach of the NBCTAA Agreement (Count I); breach of the implied covenant
of good faith and fair dealing (Count II); unfair and deceptive business
practices in violation of Mass. Gen. Laws ch. 93A (Count III);
monopolization in violation of Sherman Act § 2 (Count IV); attempted
monopolization in violation of Sherman Act § 2 (Count V); monopolization
in violation of the Massachusetts Antitrust Act (Count VI); and attempted
monopolization in violation of the Massachusetts Antitrust Act (Count VII).

DISCUSSION

Under the now-familiar standard, to survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations of a complaint must "possess enough heft" to set forth "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 559 (2007); *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008). As the Supreme Court has emphasized, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted)

### Contract-based claims (Counts I & II)

WHDH alleges that Comcast breached its commitments to provide free over-the-air television (Section 1 of the NBCTAA Agreement), including the broadcast of major sporting events (Section 2 of the NBCTAA Agreement), because some 4 million viewers with current access to NBC programming through WHDH will be unable to receive WNEU's signal.[6] While the reduced

---

[6] The Complaint is silent as to whether these viewers may have access to free over-the-air NBC programming from another source, such as WJAR, in Providence, Rhode Island.

9

access to free over-the-air NBC programming is a matter of public concern,
Comcast argues, and the court agrees, that WHDH lacks standing to enforce
Sections 1 and 2 of the NBCTAA Agreement.   The Agreement specifically
states that an affiliate station is an intended third-party beneficiary of only
Sections 3, 7(A), and 7(C), and that the Agreement "does not confer any
rights upon any individual NBC Local Affiliate, other than the rights with
respect to Sections 3, 7(A) and 7(C) set forth in the preceding sentence."
Compl. - Ex. A at 6.

Citing *Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817
F. Supp. 2d 515 (E.D. Pa. 2011), WHDH insists that, despite the unequivocal
disclaimer, as an NBCTAA member, it is entitled to intended-beneficiary
status under the entire Agreement by the governing law of Pennsylvania. *Id.*
at 529-530 ("[U]nder Pennsylvania law, express disclaimers are not
dispositive of third-party beneficiary status.").   That said, "situations in
which disclaimers are not given effect are rare.  Pennsylvania courts appear
to disregard express disclaimers only where the purported third-party
beneficiaries were the sole or primary beneficiaries of the contract's
performance." *Id.* at 530.  NBCTAA could have, as it did with Sections 3, 7A,
and 7C, bargained to extend the benefits of Sections 1 and 2 directly to the
local affiliates, but it chose not to.  To the extent that Sections 1 and 2 impose

obligations on Comcast,[7] these are concerned with protecting public access to free over-the-air programming regardless of its source, whether an NBC affiliate, or an NBC owned-and-operated station.  *See* Compl. - Ex. A at 1

---

[7] WHDH relies on the language in Section 1 that

[a]s Comcast negotiates and renews agreements with its broadcast affiliates, Comcast will continue its cooperative dialogue with its affiliates toward a business model to sustain free over-the-air service that can be workable in the evolving economic and technological environment

as a promise to negotiate in good faith with affiliate stations.  WHDH asserts that Comcast's subsequent failure to negotiate with it breached Comcast's explicit undertaking to engage in a "cooperative dialogue."  To the extent that a breach of a promise to negotiate in good faith constitutes a cognizable claim under Pennsylvania law, courts are uniform in holding that a mere promise to negotiate in good faith, absent predefined terms or a general framework in which to conduct negotiations, will not support a claim.  *See Clark Res., Inc. v. Verizon Bus. Network Servs., Inc.*, 2011 WL 1627074, at *4 (M.D. Pa. Apr. 29, 2011), citing *Jenkins v. Cty. of Schuylkill*, 441 Pa. Super. 642, 652-653 (1995); *see also Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298 (3d Cir. 1986) ("[A]n agreement to enter into a binding contract in the future does not alone constitute a contract.").

As the court explained during its dialogue with counsel at oral argument, the lack of pre-agreed terms is also an impediment to fashioning the injunctive relief sought by WHDH on its contract and antitrust claims.  The court cannot give effect to the parties' unexpressed intent.  As the Supreme Court cautioned, "[n]o court should impose a duty to deal that it cannot explain or adequately and reasonably supervise.  The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004).

("The combined entity remains committed to continuing to provide free over-the-air television through *its O&O broadcast stations* and through local broadcast affiliates across the nation." (Emphasis added)). More parochially, the losses WHDH will suffer as a result of the expiration of its affiliate contract have no causal relationship to the geographical reach of WNEU's broadcast signal and any resulting loss of access by viewers to free over-the-air television content. WHDH's losses are the same no matter how large or small is the segment of the public able to receive WNEU's signal.

WHDH is a third-party beneficiary of Section 3 of the NBCTAA Agreement. Under Section 3, Comcast agreed that

> [t]he [NBC] Network will remain solely responsible for negotiating network affiliation agreements with individual NBC Local Affiliates. Comcast Cable Communications, LLC, any of its direct or indirect subsidiaries owning, operating, or managing cable systems, and any of its affiliates that do not have an interest in NBCU (collectively, "Comcast Cable") will remain solely responsible for negotiating retransmission consent agreements with individual NBC Local Affiliates. Such retransmission consent negotiations, on the one hand, and affiliation agreement negotiations, on the other hand, will be conducted separate from, and without influence on, one another.
>
> A. Comcast shall not use its control of NBC to engage in conduct that discriminates against any NBC Local Affiliate in the terms and conditions for affiliation or other business arrangements . . . with the Network as a result of negotiations or relationships between an NBC Local Affiliate and Comcast Cable. Network affiliation shall not be withheld from an affiliate, nor shall the terms and conditions of affiliation offered or provided to any affiliate be based upon the terms

and conditions of transmission consent between such affiliate
and Comcast Cable . . . .

Compl. - Ex. A at 3.  WHDH contends that Comcast breached Section 3 by
tying the renewal of the affiliation contract to the transmission consent
negotiations.  While WHDH alleges that Comcast several times attributed its
reticence to the "continuing uncertainty in the retransmission market,"
Compl. ¶ 88, the Complaint does not suggest that Comcast sought to exploit
the delay to wring concessions from WHDH.  In fact, as the Complaint makes
clear, Comcast never entered into any affiliation renewal negotiations with
WHDH, nor does the Complaint allege that any retransmission negotiations
took place.   Although Section 3 restricted Comcast from linking the
negotiations of the two contracts, it did not impose any affirmative obligation
on Comcast to negotiate with its affiliate stations.  "Nothing in this Section 3
shall be construed to limit actions by the Network or by Comcast that are in
the ordinary course of their independent negotiations and/or relationships
that do not tie together Network affiliation and retransmission consent
negotiations." Compl. - Ex. A at 4.  Where, as here, Comcast has not engaged
in either type of negotiation, WHDH cannot plausibly allege a breach of
Section 3.[8]

---

[8] Under Pennsylvania law, the implied covenant of good faith and fair
dealing does not create substantive rights that do not exist in the contract

**Antitrust Claims (Counts IV, V, VI, and VII)**

To plead a viable claim of monopolization under the Sherman Act, WHDH must allege "'(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Diaz Aviation Corp. v. Airport Aviation Servs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013), quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966).[9]  "The elements of attempted monopolization are '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Diaz Aviation*, 716 F.3d at 265, quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Comcast maintains, and the court agrees, that its refusal to engage in renewal negotiations does not, as a matter of law, amount to monopolistic exclusionary conduct.  "'Exclusionary conduct' is defined as conduct, other

---

itself and a claim for a breach of the covenant is subsumed in the breach of contract claim.  *Burton v. Teleflex Inc.*, 707 F.3d 417, 432-433 (3d Cir. 2013).

[9] The Massachusetts Antitrust Act is to "be construed in harmony with judicial interpretation of comparable federal antitrust statutes insofar as practicable."  Mass. Gen. Laws ch. 93, § 1.

than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1182 (1st Cir. 1994) (internal quotation marks and citation omitted), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).  WHDH gives significant weight to the allegation that, after acquiring NBC, Comcast possessed "unprecedented" power in the Boston commercial television market.[10]  Mere possession of market power, however, does not an antitrust violation make.  *United States v. Microsoft, Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001).  Comcast's conduct – the non-renewal of WHDH's affiliation – cannot be construed as anticompetitive for the simple fact that WHDH had itself (years ago) bargained for a contract with an automatic expiration date and no right of first refusal.  *See Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1193-1196 (10th Cir. 2009) (Section 2 liability could not be found where a ski resort owner ended a 15-year relationship with its ski

---

[10] Comcast disputes WHDH's allegation of monopolistic power in the commercial television market because it contends that broadcast and cable television stations operate in two separate and distinct markets.  Even under the all-inclusive definition of the relevant market pled in the Complaint, Comcast is only one of 10 established commercial television outlets competing in Boston and its environs.  *See* Compl. ¶ 120.

rental facility by invoking its right to exercise a restrictive covenant in the existing contract).  WHDH does not identify any binding obligation on NBC or Comcast to immortalize the affiliation relationship with WHDH.  *See id.* at 1198 ("DVRC [(the resort owner)] should not be forever locked into a business decision made in 1990, especially when it took an affirmative step to preserve its future flexibility by bargaining for a restrictive covenant. . . . The antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path.").

WHDH maintains, however, that because Comcast admits that its newly minted owned-and-operated station is likely to be less successful than WHDH, at least in the short run, Comcast's refusal to deal is inherently anticompetitive. While one company's unilateral refusal to do business with another desirous of a relationship is not absolutely immune from antitrust scrutiny, courts have "been very cautious in recognizing [] exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Trinko*, 540 U.S. at 408.  The case of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), is "at or near the outer boundary of § 2

liability." *Trinko*, 540 at 409.  *Aspen* involved ski resort operators who
competed head-to-head in a market defined by its snow mass.

> The Aspen ski area consisted of four mountain areas.  The
> defendant, who owned three of those areas, and the plaintiff, who
> owned the fourth, had cooperated for years in the issuance of a
> joint, multiple-day, all-area ski ticket.  After repeatedly
> demanding an increased share of the proceeds, the defendant
> canceled the joint ticket.  The plaintiff, concerned that skiers
> would bypass its mountain without some joint offering, tried a
> variety of increasingly desperate measures to re-create the joint
> ticket, even to the point of in effect offering to buy the defendant's
> tickets at retail price. [*Aspen*, 472] at 593-594.  The defendant
> refused even that.  We upheld a jury verdict for the plaintiff,
> reasoning that "[t]he jury may well have concluded that [the
> defendant] elected to forgo these short-run benefits because it
> was more interested in reducing competition . . . over the long
> run by harming its smaller competitor."

*Trinko*, 540 U.S. at 408-409.

In contrast to the geographically and meteorologically conjoined
competitors in *Aspen Skiing* offering similar access to the same snow, under
the network affiliation contract, Comcast stands in a starkly different
position as a vertical supplier to WHDH.[11]  That is, it supplies the product

---

[11] WHDH contends that Comcast is also a horizontal competitor in the
Boston market because its cable transmissions compete with the broadcast
stations for viewers.  Even accepting WHDH's definition of the market, this
argument ignores a key historical fact – that WHDH's affiliate contract with
its self-executing expiration date was negotiated with NBC *before* the merger
of NBC with Comcast.  During oral argument, WHDH conceded that had
NBC, as an entity independent of Comcast, decided to replace WHDH with a
new affiliate at the expiration of WHDH's contract, there would be no
antitrust violation.  The flexibility to switch affiliates or substitute an owner-

that WHDH distributes.[12]  It is a deep-dyed canon of antitrust law that the supplier of a product may vertically integrate its distribution channels without facing liability.

> "[O]nce a firm [] has integrated vertically into distribution by acquiring one or more existing distributors, it may reduce costs by dealing only with its wholly-owned distributors [].   A distributor terminated for this reason might certainly suffer injury-in-fact, but it would not suffer antitrust injury as long as there were alternative sources of the product."

*Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 124-125 (1st Cir. 2011), quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 11 (1st Cir. 1999).   The Complaint establishes as sure as sure can be that Comcast is not suppressing dissemination of NBC programming in the Boston area, but simply replacing WHDH as the local NBC outlet with its own broadcast station.[13]

---

operated broadcast station is the right that NBC had bargained for with WHDH by incorporating the expiration date in the affiliation contract. Incongruently, WHDH also insisted at oral argument that the antitrust laws would be violated even if Comcast (not NBC) were to replace it with another affiliate instead of building its own station.  The court fails to see how the introduction of a new broadcast station into the Boston market, as Comcast proposes, would harm competition among broadcasters.

[12] The vertical relationship between a network and its affiliate stations is no more clearly illustrated than by the court's recollection that WHDH was a CBS station prior to its becoming an NBC affiliate in 1995.

[13] Comcast notes that, as acknowledged by the FCC Order, this is a business model that NBC had imposed in other large metropolitan markets long before the instant dispute with Comcast   *See* FCC Order at 173.

Nor does Comcast's new local station harm competition for viewers in the Boston commercial television market defined by WHDH.  In addition to the NBC broadcast outlet and Comcast's cable channels, this market consists of ABC, CBS, FOX, PBS affiliates, local cable stations, Verizon, RCN, Charter, and the DISH Network, Compl. ¶ 120, carrying a wide spectrum of programming content.[14]  Finally, Comcast is not alleged to have sought to hinder WHDH's ability to compete in the market by distributing non-NBC programming content.

### *Chapter 93A (Count III)*

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.  WHDH offers six legal theories to support its claim that Comcast has engaged in unfair and deceptive business practices.  First, WHDH alleges that Comcast fraudulently entered into the Affiliate Contract with the intent of "obtain[ing] the benefits of the contract, and to avoid fulfilling its own obligations under it."  *Incase, Inc. v. Timex Corp.*, 421 F. Supp. 2d 226, 239 (D. Mass. 2006).  Second, WHDH contends that Comcast misled the FCC and the public during the merger approval process by

---

[14] RCN Boston, for example, currently offers nearly 400 channels from around the world. http://www.rcn.com/boston/digital-cable-tv/channel-lineups/ (last visited May 15, 2016).

Case 1:16-cv-10494-RGS   Document 34   Filed 05/16/16   Page 20 of 23


reneging on the commitments that it made to maintain free over-the-air television in the Boston area. Third, WHDH accuses Comcast of making fraudulent misrepresentations during the run up to the disclosure of its decision not to renew WHDH's affiliation contract. Fourth and fifth, WHDH faults Comcast for engaging in "sham" negotiations and anticompetitive practices. Sixth and finally, WHDH asserts that Comcast's deceptive behavior was part and parcel of a covert plan to force the devaluation of WHDH's market value so that Comcast could acquire it at a fire sale.

Because WHDH has not plausibly alleged a breach of the NBCTAA Agreement or made out a case for cognizable exclusionary conduct, the first (contract) and fifth (antitrust) theories fail as a matter of law. With respect to the third (fraudulent misrepresentation),[15] fourth (sham negotiations),[16] and sixth (attempt to devalue and purchase) theories, while WHDH is correct that Chapter 93 is "a statute of broad impact," *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975), it nonetheless requires a plaintiff to demonstrate a causal relationship between the unfair conduct and its harm.

---

[15] Comcast also attacks the misrepresentation theory as lacking the particularity required by Fed. R. Civ. P. 9 in pleading fraud.

[16] Comcast denies that it deliberately led WHDH down a primrose path. As it points out, although no notice of an intent not to renew was required by the affiliation contract, the Complaint admits that Comcast gave WHDH 16 months' advance notice of its intentions. *See* Compl. ¶ 91.

"'[T]hat is, the plaintiff is required to prove that the defendant's unfair or deceptive act caused an adverse consequence or loss.'" *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 24 (1st Cir. 2016), quoting *Rhodes v. AIG Domestic Claims, Inc.*, 461 Mass. 486, 496 (2012).

Here, it falls woefully short of what Chapter 93A requires for WHDH to simply catalogue the damages that it predicts it will incur when its affiliate contract expires. *See* Compl. ¶¶ 152-158. Because Comcast was under no obligation to renew the contract, it cannot be held liable for the consequences of what was bargained for when the contract was formed. Rather, WHDH must allege some independent injury fairly attributable to Comcast, for example, that Comcast's alleged procrastination or misrepresentation deprived it of other business opportunities or caused it to forsake an opportunity to enter into an affiliation agreement with another content provider. *See, e.g.*, *Masingill v. EMC Corp.*, 449 Mass. 532, 540 (2007) ("To recover for fraudulent misrepresentation, a plaintiff must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and *that the plaintiff relied upon the representation as true and acted upon it to [her] damage.*") (internal quotation marks and citation omitted, emphasis added); *Goldbaum v. Weiss*, 50 Mass. App. Ct. 554, 559

(2000) (Chapter 93A applicable where defendant undertook sham negotiations with plaintiff for a joint franchise venture to frustrate the plaintiff's exercise of an option to operate a competing franchise); *DSF Inv'rs, LLC v. Lyme Timber Co.*, 2004 WL 3414427, at *18 (Mass. Super. Dec. 22, 2004), *aff'd*, 67 Mass. App. Ct. 1110 (2006) (allegations that defendant promised a partnership in order to induce plaintiff to provide valuable services, while never intending to execute a binding partnership agreement, were sufficient to plead a Chapter 93A sham-negotiation claim). Nothing in WHDH's Complaint approaches the threshold allegation that it would have pursued some alternative advantageous opportunity *but for* Comcast's representation that it would eventually agree to negotiate. The same is true of Comcast's perhaps feckless attempt to purchase WHDH after the expiration of the contract – WHDH rebuffed the bargain basement offer and consequently suffered no harm.

WHDH's remaining theory – that Comcast allegedly reneged on commitments that it made to the public and the FCC to gin up support for the merger with NBC – fails for a different reason.[17]   As the court has

---

[17] Comcast also argues that this theory fails because WHDH does not identify a breach of a specific term of the FCC Order (Commitment 1 was not incorporated in the final FCC Order), nor does WHDH point to a commitment by Comcast that it would maintain the existing signal strength of each of its NBC stations.

previously observed, while the loss, even temporarily, by some four million viewers of free over-the-air NBC programming may be a matter of public concern, it is not a concern that WHDH has standing to redress. WHDH's loss of the NBC affiliation is no doubt a blow to the station's profitability. But absent any actionable harm attributable to Comcast, it is simply an indurate consequence of doing business in a competitive and unsentimental market place.

ORDER

For the foregoing reasons, defendant's motion to dismiss is <u>ALLOWED</u>. The Clerk will close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE